## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CR-09-241-F |
| | ) | |
| JERRY DALE CASH, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE
## AND BRIEF IN SUPPORT THEREOF

PATRICK M. RYAN, OBA#7864
DANIEL G. WEBBER, JR., OBA#16332
MATTHEW C. KANE, OBA#19502

For the Firm:

RYAN WHALEY COLDIRON SHANDY PLLC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, OK  73102

ATTORNEYS FOR DEFENDANT
JERRY DALE CASH

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ..........................................................................................iii

**INTRODUCTION** ....................................................................................... 1

**ARGUMENT AND AUTHORITIES** ............................................................ 8

   **I.**    **GUIDELINE CALCULATION** ............................................................. 8

     **A.**  **There is no Shareholder Loss Attributable to Mr. Cash's Wrongdoing** ....... 8

        *1.*  *Causation* ..................................................................... 10

        *2.*  *Actual Harm* .................................................................. 12

     **B.**  **Mr. Cash's Compensation should not be Counted as a Loss Under the Guidelines** ............................................................................. 14

     **C.**  **There is no Evidence that There Are More than 250 Victims as Required for an Enhancement Under USSG § 2B1.1(b)(2)(C)** ............................ 16

     **D.**  **Mr. Cash's Actions do not Qualify as a Crime Committed by Sophisticated Means Under USSG § 2B1.1(b)(9)** .......................................... 16

     **E.**  **Mr. Cash is not an Organizer, Leader or Director of a Criminal Activity as Contemplated by USSG § 3B1.1(c)** ......................................... 18

     **F.**  **Mr. Cash did not Commit a Crime while under Supervision in 2004-2005** 19

  **II.**   **DEPARTURE FROM THE GUIDELINES** ................................... 19

     **A.**  **Mr. Cash has made Exceptional Restitution in this Case** ............. 20

     **B.**  **Mr. Cash's Ongoing Support of Sherry Cash** ............................. 22

     **C.**  **Mr. Cash's Alcoholism has Resulted in an Overstated Guideline Range** ... 22

     **D.**  **Multiple Factors Collectively Considered** ................................. 24

**CONCLUSION** .......................................................................... 25

**CERTIFICATE OF SERVICE** ...................................................................................... 26

## **TABLE OF AUTHORITIES**

**Cases**

*Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627,
   161 L.Ed.2d 577 (2005) .................................................................................. passim
*In re Cedant Corp. Litigation,* 264 F.3d 201 (3rd Cir. 2001) ............................. 13
*In re Williams Securities Litigation,* 496 F.Supp.2d 1195 (N.D.Okla. 2007) ............. 11, 13
*Irizarry v. U.S.,* 553 U.S.708, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008) ............................. 2
*Kimbrough v. U.S.,* 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) ........................ 1
*Nelson v. U.S.,* 555 U.S. ---, 129 S.Ct. 890, 172 L.Ed.2d 719 (2009) ................................ 1
*Rash v. J.V. Intermediate, Ltd.,* 498 F.3d 1201 (10th Cir. 2007) ....................................... 15
*U.S. v. Abbott,* 30 F.3d 71 (7th Cir. 1994) ........................................................................ 23
*U.S. v. Anderson,* 955 F.Supp. 935 (N.D.Ill.1997) ............................................................. 23
*U.S. v. Angel-Guzman,* 506 F.3d 1007 (10th Cir. 2007) .................................................... 23
*U.S. v. Atencio,* 476 F.3d 1099 (10th Cir. 2007) ................................................................ 2
*U.S. v. Bakhit,* 218 F.Supp.2d 1232 (C.D. Cal. 2002) ....................................................... 13
*U.S. v. Blarek,* 7 F.Supp.2d 192(E.D.N.Y. 1998) ............................................................... 1
*U.S. v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) ............................. 1
*U.S. v. Brown,* 985 F.2d 478 (9th Cir. 1993) ...................................................................... 23
*U.S. v. Collins,* 122 F.3d 1297 (10th Cir. 1997) ................................................................. 22
*U.S. v. Cooper,* 2006 WL 288704 (D. Kan. Jan 24, 2006) .................................................. 17
*U.S. v. Crockett,* 2010 WL 1049814 (10th Cir. Mar 23, 2010) ............................................ 8
*U.S. v. Davis,* 763 F.Supp. 645 (D.D.C. 1991) .................................................................. 23
*U.S. v. DeGovanni,* 104 F.3d 43 (3rd Cir. 1997) ................................................................ 18
*U.S. v. Fletcher,* 15 F.3d 553 (6th Cir.1994) ..................................................................... 23
*U.S. v. Gaither,* 1 F.3d 1040 (10th Cir. 1993) ................................................................... 19
*U.S. v. Garlich,* 951 F.2d 161 (8th Cir. 1991) .................................................................... 20
*U.S. v. Haddock,* 12 F.3d 950 (10th Cir. 1993) ............................................................. 10, 14
*U.S. v. Hammond,* 240 F.Supp.2d 872 (E.D.Wis. 2003) ................................................ 22, 23
*U.S. v. Hammond,* 37 F.Supp.2d 204 (E.D.N.Y.1999) ....................................................... 22
*U.S. v. Johnson-Dix,* 54 F.3d 1295 (7th Cir. 1995) ........................................................... 18
*U.S. v. Jones,* 158 F.3d 492 (10th Cir. 1998) ................................................................... 24
*U.S. v. Katora,* 981 F.2d 1398 (3rd Cir. 1992) .................................................................. 18
*U.S. v. Kim,* 364 F.3d 1235 (11th Cir. 2004) ..................................................................... 20
*U.S. v. Kimoto,* 588 F.3d 464 (7th Cir. 2009) ................................................................... 16
*U.S. v. Lacy,* 99 F.Supp.2d 108 (D.Mass. 2000) ............................................................... 23
*U.S. v. Leach,* 417 F.3d 1099 (10th Cir. 2005) ................................................................. 16
*U.S. v. Leviner,* 31 F.Supp.2d 23 (D.Mass. 1998) ............................................................. 23
*U.S. v. Lopez,* 222 F.3d 428 (7th Cir. 2000) ..................................................................... 15
*U.S. v. Maddalena,* 893 F2d 815 (6th Cir. 1989) .............................................................. 23
*U.S. v. Maier,* 975 F.2d 944 (2nd Cir. 1992) ..................................................................... 23
*U.S. v. Miranda,* 979 F.Supp.1040 (D.N.J.1997) ............................................................... 23

*U.S. v. Mishoe,* 241 F.3d 214 (2nd Cir. 2001) ................................................................. 23
*U.S. v. Nacchio,* 573 F.3d 1062 (10th Cir. 2009) .................................................. 10, 11, 16
*U.S. v. Olis,* 429 F.3d 540 (5th Cir. 2005) .................................................. 10, 11, 12, 13
*U.S. v. Olsen,* 519 F.3d 1096 (10th Cir. 2008) ................................................................. 8
*U.S. v. Pool,* 554 F.Supp.2d 1294 (N.D.Fla. 2008) ........................................................ 20
*U.S. v. Redemann,* 295 F.Supp.2d 887 (E.D.Wis. 2003) ................................................. 20
*U.S. v. Reyes,* 07-CR-556 (N.D.Cal. Nov. 27, 2007) ...................................................... 13
*U.S. v. Rice,* 52 F.3d 843 (10th Cir. 1995) ..................................................................... 17
*U.S. v. Rutkoske,* 506 F.3d 170 (2nd Cir. 2007) ....................................................... 11, 13
*U.S. v. Sayad,* 589 F.3d 1110 (10th Cir. 2009) ................................................................ 2
*U.S. v. Sklar,* 920 F.2d 107 (1st Cir. 1990); .................................................................. 23
*U.S. v. Smith,* 930 F.2d 1450 (10th Cir. 1991) ............................................................... 20
*U.S. v. Spencer,* 25 F.3d 1105 (D.C.Cir. 1994) .............................................................. 23
*U.S. v. Summers,* 893 F.2d 63 (4th Cir.1990) ................................................................ 23
*U.S. v. Turner,* 319 F.3d 716 (5th Cir. 2003) ................................................................ 18
*U.S. v. White,* 893 F.2d 276 (10th Cir.1990) ................................................................. 20
*U.S. v. Wilkerson,* 183 F.Supp.2d 373 (D.Mass. 2002) .................................................. 23
*U.S. v. Wilkes,* 130 F.Supp.2d 222 (D.Mass.2001) ........................................................ 23
*U.S. v. Williams,* 948 F.2d 706 (11th Cir. 1991) ........................................................... 23
*Wilshire Oil Co. of Tex. v. Riffe,* 406 F.2d 1061 (10th Cir. 1969) .................................. 14

## Statutes

18 U.S.C. § 3553(a) ....................................................................................................... 1, 2
18 U.S.C. § 3553(b) .......................................................................................................... 19

## Other Authorities

Judge Nancy Gertner, *Supporting Advisory Guidelines,* 3 Harv. Law & Pol'y
 261 (2009) .................................................................................................................. 20
Restatement (Second) of Agency § 469 ............................................................................ 15
Restatement (Third) of Agency § 8.01 .............................................................................. 15
USSG § 2B1.1(b)(2)(C) ..................................................................................................... 16
USSG § 2B1.1(b)(9) .......................................................................................................... 16
USSG § 2B1.1, cmt. (3)(A)(i) ..................................................................................... 10, 14
USSG § 2B1.1, cmt. (3)(E) ............................................................................................... 15
USSG § 2B1.1, cmt. 1 ....................................................................................................... 16
USSG § 3B1.1(c) ............................................................................................................... 18
USSG § 4A1.3 ................................................................................................................... 22
USSG § 5K2.0(c) ............................................................................................................... 24

## **INTRODUCTION**

"Sentencing…represents an important moment in the law, a fundamental judgment determining how, where, and why the offender should be dealt with for what may be much or all of his remaining life.  It is significant not only for the individual before the court, but for his family and friends, the victims of his crime, potential future victims, and society as a whole."  *U.S. v. Blarek,* 7 F.Supp.2d 192, 199 (E.D.N.Y. 1998).  The Court possesses great discretion in making such a determination.  In light of *Booker* (*U.S. v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)) and its progeny, it is clear that the guidelines are but one of many factors to be considered by the sentencing court. *Kimbrough v. U.S.,* 552 U.S. 85, 90, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007).  Moreover, "the Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. U.S.,* 555 U.S. ---, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009) (emphasis added).  The Court must determine what type and length of sentence, if any, is sufficient, but no greater than necessary, to comply with 18 U.S.C. § 3553(a).  The astronomical guideline range calculated in Mr. Cash's Presentence Report is clearly far beyond the sentence sufficient to comply with those factors.  The government has recognized the infirmity of this calculation, agreeing not to request a sentence of more than ten years in exchange for Mr. Cash's plea to a statute with a minimum sentence of probation and a maximum of twenty years' incarceration.

While the guidelines are prohibitive here, it is nonetheless appropriate to begin the sentencing analysis with a guideline calculation.  *Nelson,* 129 S.Ct. at 891-92.  This Motion seeks a downward departure, which arises "when a court reaches a

1

sentence…below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines." *U.S. v. Atencio,* 476 F.3d 1099, 1101, n. 1 (10th Cir. 2007), *overruled in part on other grounds by Irizarry v. U.S.,* 553 U.S.708, 128 S.Ct. 2198 , 171 L.Ed.2d 28 (2008).[1]

Because the sentence must be the minimum necessary to comply with 18 U.S.C. § 3553(a) it is important to note that there is nothing to suggest that Mr. Cash poses any future threat to the community – he can no longer serve as an officer or director of any public company, having agreed to lifetime bans with the Securities Exchange Commission and the Oklahoma Department of Securities, and has not committed any crimes in the nearly two years since he began treatment for alcoholism. As recidivism is of limited concern, incarceration cannot be justified given Mr. Cash's extraordinary restitution efforts, his rehabilitation from the grip of alcohol, and his ex-wife's extreme reliance on his continued support.

An overview of Mr. Cash's personal history, leading up to and including the instant offense, provides context for the Court's determination. Mr. Cash grew up in a middle-class home in Shawnee and graduated from the local high school. He took some college courses but left school before obtaining a degree to begin working as a roughneck for a drilling contractor. Presentence Report "PSR," ¶ 75. When he was only twenty-six years old, he started STP, an oil and gas exploration company. The company grew under

---

[1]Mr. Cash has filed a companion motion for variance addressing the § 3553(a) factors, which, as opposed to a departure, occurs "[w]hen a court enhances or detracts from the recommended range through application of § 3553(a) factors." *Atencio,* 476 F.3d at 1101; *see also U.S. v. Sayad,* 589 F.3d 1110, 1119, n. 4 (10th Cir. 2009).

his leadership for the next fifteen years until it merged with Quest Resources in 2002.  At that time, he became co-CEO and later the sole CEO of Quest.  Mr. Cash continued to build the company until it had an enterprise value of over $700 million.  Under his direction, Quest developed thousands of wells in northeast Oklahoma and southeast Kansas employing hundreds of local citizens and paying millions dollars per month to local royalty owners, including many farmers and retirees who will continue to enjoy payments for at least the next 20 years.  In addition the gross production taxes paid from this production will yield Oklahoma and Kansas over $70 million through out the life of these wells.

Mr. Cash's focus on the success of his company did not come without a price.  He allowed his relationship with his wife to deteriorate.  He became extremely dependent on and abusive of alcohol, which negatively affected his decision-making, including decisions about the cost (and financing) of the lifestyle he and Sherry Cash were leading.  More importantly, he began to rely too heavily on the advice of David Grose, Quest's chief financial officer and SEC compliance officer, who suggested Mr. Cash take a line of credit from the company which would alleviate financial shortfalls to his cashflow.  Grose had eighteen years of experience with public companies, most of the time serving as chief financial officer – Mr. Cash had no reason to suspect Grose would misinform him.  As is now all too apparent, however, Grose's interests were neither aligned with those of Quest nor Mr. Cash.

In 2004, when Mr. Cash wanted to borrow money for authorized outside investments (which he vetted to the Quest Board of Directors to ensure the company did

not have an interest in the potential acquisition), Grose suggested Mr. Cash simply borrow the money from Quest, advising him that such a practice was normal in private and public companies.  Mr. Cash believed the recently passed Sarbanes-Oxley laws were directed at outside auditors and was not aware that the new law prohibited advances to corporate officers.  In fact, as late as June 2008, Mr. Cash was encouraging Grose and other Quest officers and employees to attend seminars on Sarbanes-Oxley compliance. (*See* Exhibit 1, Email dated 06/12/08 from Jerry Cash.)  Prior to the second quarter of 2008, Grose repeatedly advised Mr. Cash when and how to repay advances each quarter to purportedly comply with GAAP, which Mr. Cash believed exclusively governed the filings.

Mr. Cash always intended to pay the balance of the advances from Quest as he would have with any line of credit – just like he had done with the initial advances he had taken in 2004.  Mr. Cash had significant assets (including his holdings as one of the largest shareholders of Quest) which he reasonably believed were worth more than the balance of the advances from the company and other debts.  In the spring of 2008, prior to Mr. Cash learning that he was under investigation, the Mr. and Mrs. Cash decided to downsize.  They put their Nichols Hills home on the market fully intending to use the proceeds to buy a smaller home and reduce debt.  (*See* Exhibit 2, Potter Letter.)

In early July 2008, Mr. Cash overheard Grose on a conference call with the outside auditors, representing that Rockport was a "scout" company used to investigate oil and gas properties on Quest's behalf.  PSR, ¶¶26a-28.  This was the first time Mr. Cash was aware that Grose was using such a story and that the company's upcoming

4

quarterly report could not be correct under SEC rules without disclosing the advances to Mr. Cash.  He did not bring this to the board's attention and he initially adopted the "scout" story he had overheard Grose tell the auditors.  After the auditors learned of Grose's deception and the true nature of the advances, they refused to sign off on the Quest financials unless Mr. Cash repaid the advances by the SEC filing date of August 18, 2008.[2]  PSR, ¶29.

As a result of the auditor's demand, Mr. Cash stepped up his effort to sell his home by contacting businessman Harold Hamm and began making calls to raise money on proposed outside business ventures in a last ditch effort to come up with $10 million before the deadline.  PSR ¶30.  His timing could not have been worse.  In August 2008 the economy was in trouble, as financial markets and real estate values plummeted.[3]  Out

---

[2] The auditors would later testify that the $10 million was not material to Quest's overall financial wellbeing.  *See* Exhibit 3, Charles Alexander Gray SEC Testimony, 65:17-66:8 ("$10 million wasn't a big number in connection with the size of transactions that they'd been making and he'd been responsible for…it just didn't dawn on me that that was material in relationship to all the size of the transaction that were taking place…"); and *see* Exhibit 4, John W. Jacobsen, SEC Testimony, 66:19-67:12 ("it was not my professional judgment that that in and of itself was material, because we were talking about an entity that had $800 million in assets, and so a classification of 10 million between cash and a current accounts receivable perhaps was not material.").

[3] This period of late August/early September was also the period in which natural gas prices, followed by the entire economy, entered into a freefall. *See, e.g.,* Lehman Brothers Press Release of September 15, 2008 announcing intent to file bankruptcy (available at http://www.lehman.com/press/pdf_2008/091508_lbhi_chapter11_announce.pdf (last visited 09/27/10)).  Quest fell on hard times, as did many now bankrupt oil and gas exploration companies, including several in Quest's peer group.  At the same time, the Cashes' home remained on the market.  They had spent over $10 million on their home, and their realtor hoped to obtain a similar sale figure.  *See* Ex. 2.  Unfortunately, Mr. and Mrs. Cash were only able to clear $2 million from the sale of their home.  As a result of delays in obtaining government clearance of the home sale, the buyer, Harold Hamm, reduced his offer by $1.5 million.  *See* Exhibit. 5, *Hamm Letter of 03/01/10.*

of desperation, Mr. Cash gave Grose a check for the $10 million, hoping, perhaps unrealistically, that he would either be able to close a sale on his home or another potential business transaction before the check cleared.  He asked Grose to hold the check until he could pay the Quest advance balance.  PSR, ¶31.  In his mind, he was in a "no win" position—if he wrote the check it would not clear if he did not close either his home sale or another venture; if he did not write the check the company would suffer the considerable greater consequences of its outside auditors refusing to sign the company's quarterly and required SEC financial report.  Mr. Cash was unable to come up with the funds to make his check good, and Grose sent the $10 million check through for collection a week after receiving it from Mr. Cash.

Mr. Cash profoundly regrets his actions and the effects of his actions on others, including his family and those associated with the company that he helped build. Mr. Cash admits that he was wrong when he certified the quarterly report, since it did not reflect his advances from the company. He also fully acknowledges that he should not have presented the check without sufficient funds to pay the debt.  He has accepted his responsibility for this conduct.  His first action to set things right was to resign as CEO of Quest and invite the Quest board to take his Quest stock.  PSR ¶32.  He then began to make extraordinary efforts to repay his Quest advances.  He sold his home, surrendered ownership of his oil and gas interests, transferred his interests in all of his business assets and transferred his funds in the State's unclaimed property fund.  He moved into a one-bedroom apartment with rented furniture and got a job.  PSR ¶¶78, 92.  Most recently, Mr. Cash entered into a voluntary agreement with PostRock Energy Corporation.

Quest's successor, wherein the parties agree Mr. Cash has repaid $6 million in assets and home proceeds as of August 31, 2010, as well as additional payment of $1 million in September of this year.  Mr. Cash was able to make this additional $1 million payment due to the success he has enjoyed while employed by Riata Management, L.L.C.  The current terms of Mr. Cash's agreement with Riata call for him to receive $20,000 per month plus the ability to make considerable bonuses each year based on his performance.  If Mr. Cash pays PostRock $400,000 per year for the next 10 years then PostRock will waive the final $1 million and will consider all of Mr. Cash's restitution obligations fulfilled.  This agreement has been provided to the U.S. Probation Office and the U.S. Attorney.

Mr. Cash has also done all he could to repair his personal life.  He was heavily abusing alcohol when he made his worst decisions, which are outlined in the Information and the PSR.  He sought intensive intervention and successfully completed a comprehensive alcohol treatment program from Talbot Recovery Campus, one the nation's top treatment centers.[4]  Since his discharge, Mr. Cash has started an Alcoholics Anonymous chapter in Oklahoma City for the many local graduates of Talbot.  His sobriety date is November 4, 2008, and it remains the most important day of his life.  Mr. Cash is also attempting to rebuild his relationship with his ex-wife, who is in a very fragile state, as discussed in the supplement Mr. Cash has moved to file under seal.

---

[4] Talbot's reputation is well known.  Although located in Atlanta, Georgia, the Oklahoma Medical Association requires any of its doctors with substance abuse problems to participate in its program as a condition of maintaining or reissuing their licenses.

For the reasons set forth herein, Mr. Cash respectfully asks the Court to sustain his objections to the presentence report, thereby correcting the advisory sentencing guidelines calculation. Further, Mr. Cash asks the Court for a downward departure to an offense level in Zone A, further enabling the Court to consider a sentence of probation under the guidelines.

## ARGUMENT AND AUTHORITIES

### I.    GUIDELINE CALCULATION

As noted in Defendant's objections to the PSR, Mr. Cash contends there are a number of guideline enhancements that should not be applied; however, even a lower offense level greatly overstates the minimum necessary sentence in this case.

### A.    There is no Shareholder Loss Attributable to Mr. Cash's Wrongdoing.

Regardless of what standard of proof is to be applied,[5] it is clear that the loss calculation is the single most important factor the Court must address in determining the appropriate guideline range.   Mr. Cash's base level offense is a 7.   *See PSR,* ¶ 49. However, the proposed total loss amount increases the offense level by 26 levels or 470%.   Even assuming all 11 levels of the additional enhancements set out in the PSR (other than loss amount) are correct, which Mr. Cash contests, the proposed total loss

---

[5] The Tenth Circuit has "reserved the question of whether, in some extraordinary or dramatic case, due process might require a higher standard of proof."   *See U.S. v. Crockett,* 2010 WL 1049814, *2 (10th Cir. Mar 23, 2010), *quoting U.S. v. Olsen,* 519 F.3d 1096, 1105 (10th Cir. 2008)
.

amount is more than twice the base offense level offense and all other enhancements combined.

In the instant litigation, the government has offered a report by Professor Scott Linn, purporting to estimate the effects of Mr. Cash's conduct on Quest shareholders.  It essentially takes the average price times the number of shares for the day before Quest's August 28, 2008 public disclosure less the average price times the number of shares the day after, with some minor adjustments to reflect broad market changes over those same few days.  While this may serve as a rudimentary event study, Professor Linn's measure of market capitalization decline inadequately addresses both causation and actual harm to shareholders.  *Deal Statement,* ¶ 3.[6]  Using very conservative assumptions, the actual loss to shareholders (here, the "net harm")[7] ranges from a net loss of $3.9 million to a showing of no harm.  *Id.* at 7.

A concrete example of the net harm concept follows:

I invested in the stock of Quest Resource Corporation in May, 2008.  At that time I purchased shares of $8.98 per share...

When I heard the announcement in late August 2008 about Mr. Cash's problems and resignation, I sold my stock for $5.36 per share.  Had the

---

[6] Notably, Mr. Cash's expert, Bruce Deal, also served as expert for Ernst & Young in the Williams Securities litigation and prepared a report which assisted in establishing the fatal flaws of the plaintiff's expert in that case.  While this Motion briefly addresses Mr. Deal's criticism of Professor Linn's report and touches on Mr. Deal's conclusions, it provides only a small sampling of the problems with Professor Linn's report and the more accurate estimate of actual shareholder loss contained in Mr. Deal's Statement, which has previously been provided to the Court and the government.

[7] A "net harm" valuation is necessary as identifying which shareholders fall into a loss category is extremely difficult if not impossible, given the individual factors in each sale. *Deal Statement,* ¶ 11.

announcement not been made, I would have held my stock in QRC and would have lost virtually all of my QRC investment…

As it turns out, the events involving Mr. Cash's conduct actually caused me to sell the QRC stock earlier than I had planned…Thus, far from causing me to lose money; these events actually prevented me from essentially losing my entire QRC investment.

See Exhibit 6, *Cooper Letter.*

### 1.    Causation

"Actual loss" is defined as the "reasonably foreseeable harm that resulted from the offense."  USSG § 2B1.1, cmt. (3)(A)(i).  "A court should measure actual loss by how much better off the victim would be but for the defendant's fraud."  *U.S. v. Haddock,* 12 F.3d 950, 961 (10th Cir. 1993).   In other words, actual loss "incorporates [a] causation standard that, at minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e., guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)."  *U.S. v. Olis,* 429 F.3d 540, 545 (5th Cir. 2005).  Thus, in *U.S. v. Nacchio,* 573 F.3d 1062, 1068 (10th Cir. 2009), the Tenth Circuit remanded the case for resentencing, directing the district court to "undertake thorough analyses grounded in economic reality…and deem[ing] it appropriate to look to the civil sphere for guidance regarding the proper approach."[8]  The Tenth Circuit relied heavily on *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), which establishes that "a private plaintiff cannot prove that a defendant's fraud caused an economic loss simply by

---

[8] It should be noted that, as an insider trading case, *Nacchio* applied a different sentencing guideline; nonetheless, the principles it espouses regarding *Dura* and loss calculations are clearly applicable here.

demonstrating that the price of the security was inflated on the date that he or she purchased the security." *Nacchio,* 573 F.3d at 1074. *Dura* requires a "causal connection between the material misrepresentation and the loss," which could be established by "showing that the disclosure of the relevant truth resulted in a loss attributable to the earlier misrepresentation." *In re Williams Securities Litigation,* 496 F.Supp.2d 1195, (N.D.Okla. 2007) (internal citations and quotations omitted).

The Tenth Circuit also relied on *Olis,* 429 F.3d at 545-49, which expressly applied *Dura* in the criminal context: "[S]tock price movements based upon factors unrelated to the defendant's offense should be excluded from a Guideline loss determination." *Id.* at 1075; *see also U.S. v. Rutkoske*, 506 F.3d 170, 179 (2nd Cir. 2007) (seeing "no reason that the considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence.").

In light of these authorities, two aspects of causation must be examined here. First is market performance. Professor Linn's initial mistake is to use an overly broad market index as his baseline. *Deal Statement,* ¶¶ 24-26. Without accurate comparisons, Professor Linn cannot correctly assess the actual cause of shareholder losses. Professor Linn's "day before, day after" sampling also fails to accurately reflect overall market trends. Market-related activity is the key cause of the loss here. *Id.* at ¶¶ 5-6. As in *Olis,* 429 F.3d at 548, Mr. Deal's "report demonstrates that [Quest] stock declined during the period covering [Mr. Cash's conduct] in tandem with the stocks of other publically traded companies in the [same] business." Professor Linn's approach should at least

acknowledge in some way that loss was exacerbated by the overall market trends and account for the massive volatility in Quest's market sector. *Deal Statement,* ¶¶ 43-48. If such a revelation had come to light in a bull market (as opposed to the drastic losses being suffered by natural gas producers at the time) it would seem likely that there might be little or no loss as a response to the $10 million advance.

Second and perhaps more importantly, Professor Linn fails to make any allowance for "confounding news." *Deal Statement,* ¶¶ 32-38. The press release which serves as the "disclosure" around which the entire loss analysis is built contains some news about Mr. Cash, but it also contains information about Grose being placed on administrative leave, Mr. Cash's replacement, the resignation of a board member with nominating and auditing responsibilities, and the undertaking of a detailed strategic review of the Quest entities. *Id.,* at 33-37. Without further analysis (of the kind performed by Mr. Deal), Professor Linn's report does not comply with the requirements of *Dura* and its progeny.

### 2.   *Actual Harm*

Professor Linn's analysis fails to address multiple aspects necessary to reach a conclusion as to the actual harm caused to the shareholders. First, Professor Linn focuses only on the share price the day before the press release and not on the actual purchase price of the individual shareholders. *Deal Statement,* ¶ 5. "[T]he Government's use of stock prices the day before and the day after the revelation of the fraud did not account either for the ***actual price at which most holders purchased the company's shares***, or for the influence of outside factors on the change in price." *Olis,* 429 F.3d at 547 (emphasis

added); *see also U.S. v. Bakhit,* 218 F.Supp.2d 1232, 1239 (C.D. Cal. 2002).[9]

Consequently, the Fifth Circuit determined "[t]he government's approach measured

***paper losses*** in the company's value, which have no correlation with losses to actual

shareholders who bought or sold based on [claimed] fraudulent information." *Olis,* 429

F.3d at 547; *see also Deal Statement,* ¶ 41.

Second, Professor Linn essentially assumes a sale date on the date after the disclosure.

While Professor Linn notes that Quest entity prices were dramatically lower 90 days

following disclosure of the unauthorized advances, he offers no opinion or analysis as to

why this is the case or how this important fact affects harm. *Id.* at ¶ 6. Clearly, the

analysis of the individual shareholder's sale date is essential to determining actual loss.

"If the purchaser ***sells*** later after the truth makes its way into the marketplace, an initially

inflated purchase price *might* mean a later loss." *Dura,* 544 U.S. at 342; *see also*

*Rutkoske,* 506 F.3d at 170 (noting that *Dura* addressed "an artificially inflated price

---

[9] *U.S. v. Reyes,* 07-CR-556 (N.D.Cal. Nov. 27, 2007) (conviction later reversed, *see* 577 F.3d 1069 9th Cir. 2009), (Doc. 737, Exhibit 7), provides a useful hypothetical: "Suppose that Samantha Shareholder bought one share of Cendant stock at $20. The stock then rose to $25, but when the fraud was announced it dropped to $15, whereupon Shareholder sold. Shareholder's damages are $5 because that is the difference between what she paid for the stock and what she sold it for after the fraud was revealed ($20-$15)…If we used the drop in market capitalization to determine Shareholder's damages, however, we would conclude that she had damages of $10 ($25-$15), which is greater than her out-of-pocket loss and is thus not a proper measure of her damages." *Id.* at 5-6, *quoting In re Cendant Corp. Litigation,* 264 F.3d 201, 242 (3rd Cir. 2001). While the "out-of-pocket" measure of damages – "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct," *In re Williams Securities Litigation,* 496 F.Supp.2d at 1294, n. 93 – appears to have been supplanted, or at least supplemented, by *Dura's* loss causation analysis, an economic study which cannot meet the "out-of-pocket" damages analysis certainly cannot meet *Dura's* causal requirements.

might cause an investor's loss when the investor sells his shares").  "Other things being

equal, the longer the time between purchase and **sale**…the more likely other factors

caused the loss."   *Id.* at 343.  While there is no case law directly on point, the Tenth

Circuit has, in certain fraud contexts, defined actual loss as "the amount of money the

victim has actually ended up losing at the time of sentencing [here, the amount

attributable, under *Dura*, to Mr. Cash's conduct], not what it could have lost."  *Haddock,*

12 F.3d at 961.  Reading *Haddock* in conjunction with *Dura's* causal requirements

clearly provides that the loss must be "actual" – a real, concrete loss – not merely an

unrealized drop in the market share.  The government's calculation wholly fails to

address the amount the shareholders actually ended up losing in favor of a simplistic

approach addressing only the change in share price on August 25, 2008.  Therefore, it

should not be relied on by the Court.

> **B.      Mr. Cash's Compensation should not be Counted as a Loss
> Under the Guidelines.**

Adding compensation (including his salary, bonuses and any awards of treasury

stock not included in the base compensation schedule) to the guideline loss calculation is

a novel assessment, without support in case law interpreting guideline loss and runs

counter to the guidelines' definitions of actual loss and relevant conduct.  PSR, ¶41 and

objection thereto.  "Actual loss," as noted above, is the "reasonably foreseeable harm that

resulted from the offense."  USSG § 2B1.1, cmt. (3)(A)(i).  While *Wilshire Oil Co. of

Tex. v. Riffe,* 406 F.2d 1061 (10th Cir. 1969), provides that, in a civil context, an agent

may forfeit his compensation for a willful and deliberate breach of his contract of service,

Mr. Cash's compensation is not a loss under the guidelines, as it simply cannot be considered a reasonably foreseeable harm that resulted from the offense.[10]  If Mr. Cash's compensation is a "loss" to Quest, then the value of the "services rendered" above must be calculated and applied as a credit against the loss pursuant to USSG § 2B1.1, cmt. (3)(E).  *See, e.g., U.S. v. Lopez,* 222 F.3d 428, 433, 438-439 (7th Cir. 2000).  To count Mr. Cash's compensation from Quest over a several year period as "loss" ignores the fact he built the company from the ground up and engineered the expansion of Quest to a 400 person work force.  This growth, in turn, resulted in the payment of millions of dollars to royalty owners and increased the value of the company and its stock for years.  At a minimum, the value of the services rendered to Quest is the compensation he was paid; however, the growth of the company attributable to Mr. Cash's efforts is far beyond his personal compensation.  Failure to credit back this value would be an inconsistent mixture of a calculation based partly on "loss" to Quest and "gain" to Mr. Cash, and thus should not be included in the loss calculation.

---

[10]  Importantly, *Wilshire,* while arising from Northern District of Oklahoma, makes no effort to interpret Oklahoma law, instead relying solely on the Restatement (Second) of Agency § 469.  *Compare Rash v. J.V. Intermediate, Ltd.,* 498 F.3d 1201, 1212 (10th Cir. 2007) (specifically citing to and applying Texas law on agent forfeiture).  This section of the Restatement has not been adopted by Oklahoma.  Moreover, in 2006, the American Law Institute issued the Restatement (Third) of Agency, § 8.01 (the "counterpart" of § 469, among others), which now states: "The better rule permits the court to consider the specifics of the agent's work and the nature of the agent's breach of duty and to evaluate whether the agent's breach of fiduciary duty tainted all of the agent's work or was confined to discrete transactions for which the agent was entitled to apportioned compensation."  *Id.,* cmt. d(2).

### C.   There is no Evidence that There Are More than 250 Victims as Required for an Enhancement Under USSG § 2B1.1(b)(2)(C).

Based only on an October 29, 2009 letter from Jack Collins, who was, at the time, the Executive Vice President of Finance and Corporate Development for Quest, Mr. Cash has been assessed an additional six points under USSG § 2B1.1(b)(2)(C).  PSR, ¶39 and objection thereto.   Mr. Collins' letter merely notes that Quest has "thousands" of shareholders.   However, neither the Collins letter nor the government's event study address which or how many shareholders made or lost money as a result of Mr. Cash's conduct.  A victim must be a "person who sustains any part of the actual loss…"  USSG § 2B1.1, cmt. 1; *see also U.S. v. Leach,* 417 F.3d 1099, 1006-07 (10th Cir. 2005).  As noted above, identifying which shareholders had an actual loss as opposed to those shareholders who had a gain (or broke even) is extremely difficult if not impossible, given the individual factors in each sale.  *Deal Statement,* ¶ 8.  Contrary to the PSR's "reasoning" that because stock prices fell from August 22, 2008 to August 25, 2008 following the press release related to the authorized transfers, each individual stock holder suffered a financial loss, "the stock here was not totally worthless after the conspiracy was discovered.  Thus, not every shareholder suffered a loss." *Nacchio,* 573 F.3d at 1062.  Where there is no proof of the number of victims, the § 2B1.1(b)(2)(C) enhancement is inappropriate.  *See U.S. v. Kimoto,* 588 F.3d 464, 496-497 (7th Cir. 2009).

### D.   Mr. Cash's Actions do not Qualify as a Crime Committed by Sophisticated Means Under USSG § 2B1.1(b)(9).

USSG § 2B1.1(b)(9), provides a two-level enhancement if the offense involved sophisticated means, which is defined as:

> [E]specially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

The guidelines have provided several examples of sophisticated means: (1) relocating a fraudulent scheme to avoid detect; (2) committing a substantial part of the fraudulent scheme from outside the United States; (3) hiding assets through the use of fictitious entities, corporate shells, or offshore accounts.  In any case, the sophisticated means must be ***especially complex or especially intricate as compared to other similar crimes***. *See, e.g., U.S. v. Rice,* 52 F.3d 843, 849 (10th Cir. 1995); *U.S. v. Cooper,* 2006 WL 288704, *16 (D. Kan. Jan 24, 2006).

Here, the PSR applies the sophisticated means enhancement based on "the secretive nature of the NBC account along with the fictitious explanation of the transfers."  *See PSR,* ¶ 52.  There is no suggestion that Mr. Cash relocated the scheme out of state or country or that he created any fictitious entities or corporate shells.  The PSR notes that the wire transfers from Mr. Grose went to an account of "Rockport Energy."  However, such conduct simply is not "especially complex or especially intricate"; rather, it is exactly the same type of conduct that would occur in virtually every case where spending is not disclosed.

### E.   Mr. Cash is not an Organizer, Leader or Director of a Criminal Activity as Contemplated by USSG § 3B1.1(c).

"The primary concern of section 3B1.1 is the imposition of a punishment commensurate with the defendant's *relative* responsibility within a criminal organization." *U.S. v. Johnson-Dix,* 54 F.3d 1295, 1309 (7th Cir. 1995) (emphasis added) (internal quotations omitted).  Mr. Cash was not a "manager or supervisor" of Mr. Grose, nor did he have relative responsibility greater than Mr. Grose *as it relates to the offense conduct.  See, e.g., U.S. v. DeGovanni,* 104 F.3d 43 (3rd Cir. 1997) ("one is only a 'supervisor' under U.S.S.G. § 3B1.1(c) when…he actually supervises their illegal conduct, and is not just a supervisor by virtue of his *de jure* position in the police department hierarchy").  Grose, an accountant and the officer within Quest responsible for compliance with Sarbanes-Oxley, advised Mr. Cash the advances were legal.  Grose had the greater knowledge of the accounting entries, the GAAP accounting rules, and the requirements of Sarbanes-Oxley, while Mr. Cash does not have a college degree, has no formal experience in accounting and relied on Grose.  At most, the two men share equal responsibility for the advances, the transfers between accounts, and the August 11, 2008 certification of the Quest financials.  "Here, because the only two participants were equally culpable and, furthermore, because they did not organize, lead, manage or supervise a third participant," this enhancement does not apply.  *U.S. v. Katora,* 981 F.2d 1398, 1405 (3rd Cir. 1992).[11]

---

[11] As noted in the revised PSR, p. 36, *U.S. v. Turner,* 319 F.3d 716, 725 (5th Cir. 2003) applies 3B1.1(c) where the defendant "directed [another member of the drug conspiracy] in numerous ways."  It is thus factually distinguishable from the instant circumstances

### F.    Mr. Cash did not Commit a Crime while under Supervision in 2004-2005.

Mr. Cash pled guilty to a misdemeanor DWI charge in 2004 and was given a one-year suspended sentence.  Later that year, Mr. Cash took two advances from Quest.  Mr. Cash was told repeatedly by Mr. Grose that the Quest financials were correct and in accordance with GAAP, regardless of the status of the advances to Mr. Cash.  In 2004, Mr. Cash did not know advances to officers of public companies were illegal.  In fact, Mr. Grose told him just the opposite.  Further, the 2004 advances were within what Mr. Cash believed to be his authority for company expenditures at the time. Mr. Cash's 2004 advances were repaid in full in September 2004, and there were no more advances until June 2005, some 10 months later.   Mr. Cash was no longer serving his suspended sentence nor otherwise on probation when he began taking advances again in 2005.

## II.    DEPARTURE FROM THE GUIDELINES

Even assuming the Court agreed the enhancements discussed above do not apply, the guidelines overstate Mr. Cash's culpability, and a departure is warranted.  18 U.S.C. § 3553(b) provides that a district court may depart from the guidelines if "there exists [a] ... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *U.S. v. Gaither,* 1 F.3d 1040, 1043 (10th Cir. 1993).   Thus, the guidelines "were not comprehensive, but rather had gaps intended to be filled by judges' power to depart."   Judge Nancy Gertner, *Supporting*

---

where Mr. Cash relied on Mr. Grose, save for one instance identified in the PSR where he "directed Grose to transfer funds."  *See* Revised PSR, ¶ 55.

*Advisory Guidelines,* 3 Harv. Law & Pol'y 261, 267-68 (2009).  Comment 3 to USSG 5K2.0 acknowledges that departures may be appropriate for "circumstances of a kind not adequately taken into consideration in the guidelines" and "circumstances that are present to a degree not adequately taken into consideration in the guidelines."  *See also U.S. v. Smith,* 930 F.2d 1450, 1454 (10th Cir. 1991).  Thus, "when a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."  *U.S. v. White,* 893 F.2d 276, 278 (10th Cir.1990).

### A.      Mr. Cash has made Exceptional Restitution in this Case.

Extraordinary restitution may be an appropriate basis for downward departure. *See U.S. v. Kim,* 364 F.3d 1235, 1238-1240 (11th Cir. 2004) (to "join with the Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits," the Eleventh Circuit held that "extraordinary restitution, whether paid before or after adjudication of guilt, may, in the unusual case, support a departure from the guidelines."); *see also U.S. v. Garlich,* 951 F.2d 161, 163 (8th Cir. 1991); *U.S. v. Pool,* 554 F.Supp.2d 1294, 1298 (N.D.Fla. 2008); *U.S. v. Redemann,* 295 F.Supp.2d 887, 899 (E.D.Wis. 2003) (listing "the defendant's effort to remedy the wrong…where he makes extraordinary restitution" as one basic situation where departure appropriate).[12]

---

[12] Notably, in a 2010 USSC survey, 75% of judges found that exceptional efforts to fulfill restitution obligations were relevant in determining whether to depart from the guideline range. USSC, *Results of Survey of United States Judges* (June 2010), available at http://www.ussc.gov/Judge_Survey/2010/JudgeSurvey_201006.pdf        (last        visited 09/27/10).

As noted above, Mr. Cash has now made restitution totaling $7 million to Quest or its successor.  By October 26, 2008, Mr. Cash had a buyer lined up and a draft contract for the sale of the home and its contents ready for execution.  *See* Exhibit 8, Emails dated 10/26/08 and 10/28/08 from Robert Sussman.)   A comprehensive settlement agreement with Quest was reached in May 2009 resulting in the sale of the house and the transfer of oil and gas properties.  Joe Holzer, counsel for Quest at the time of these transfers noted:

> We were able to settle the law suit in large part because of the invaluable assistance of Cash and his counsel.  Not only did Mr. Cash and his counsel agree to a settlement without the usual pre-trial skirmishing, but they were active in the negotiations with others, Rockport Energy and its principles, who were also sued by Quest.  I doubt that the Rockport action would have been settled without the help of Mr. Cash and his counsel, who was acting at Mr. Cash's direction.
>
> It was refreshing that Mr. Cash did not deny that he owed Quest $10 million or engage in other activities that would have prolonged the matter or lessened Quest's recovery.  Mr. Cash could have filed bankruptcy or taken an adversarial position in the litigation that would have increased Quest's costs and decreased the assets available to settle the matter.  Although Mr. Cash's financial situation did not allow him to repay $10 million in cash, he was willing to convey substantially all of his unencumbered assets to Quest.

*See* Exhibit 9, Holzer letter.

In addition to transferring his own interest in Rockport Energy to Quest, Mr. Cash facilitated the transfer to Quest of over $1.6 million in assets from Bryan Simmons and Steve Hochstein, who were former Quest employees and Mr. Cash's Rockport partners. *See* PSR Objections to ¶¶ 44-45.  While not Mr. Cash's funds, these funds also directly contributed to making Quest whole.  When Mr. Cash was able to find employment he paid half his gross monthly income to Quest for a period of several months and recently

paid Quest's successor an additional $1 million made possible by his continued employment with Riata. Such conduct is simply not considered by the guidelines, except under U.S.S.G. § 5K2.0's contemplation of a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."

### B.   Mr. Cash's Ongoing Support of Sherry Cash.

Mr. Cash provides ongoing support of his ex-wife Sherry Cash, as discussed in detail in the proposed sealed Supplement delivered to the Court Clerk's office today.

### C.   Mr. Cash's Alcoholism has Resulted in an Overstated Guideline Range.

USSG § 4A1.3 specifically recognizes that a Court may depart from the guidelines where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."

> The purpose of section 4A1.3 is to allow a district court to deviate from the otherwise applicable guideline range where a defendant's criminal history, likelihood of recidivism, or both differ significantly from the typical offender for whom the applicable criminal history category was formulated.

*U.S. v. Collins,* 122 F.3d 1297, 1304 (10th Cir. 1997), *superseded by statute on other grounds*, 332 F.3d 1294 (10th Cir. 2003).

Among other factors, "the court may analyze whether the prior offenses were committed while the defendant was under the influence of drugs or alcohol…" *U.S. v. Hammond,* 240 F.Supp.2d 872, 878 (E.D.Wis. 2003), *citing U.S. v. Hammond,* 37 F.Supp.2d 204, 205 (E.D.N.Y.1999) (departing three categories where prior arrests resulted from minor drug related crimes); *U.S. v. Lacy,* 99 F.Supp.2d 108, 119 (D.Mass.

2000); *U.S. v. Abbott,* 30 F.3d 71, 72-73 (7th Cir. 1994). "Particularly if the defendant has taken steps to deal with his substance abuse or mental illness, the court may conclude that counting the offenses committed while suffering the effects of addiction or illness results in an overstatement of the seriousness of his criminal history or the likelihood that he will repeat his crimes." *Hammond,* 240 F.Supp.2d at 878; *see also U.S. v. Fletcher,* 15 F.3d 553, 557 (6th Cir.1994), *overruled on other grounds,* 107 F.3d 1147 (6th Cir.1997).

Similarly, the court may consider "the circumstances of the prior convictions." *Hammond,* 240 F.Supp.2d at 879. "While the guidelines focus on the *length* of the prior offenses, analysis of the *nature* of the offense may better reflect the seriousness of the record and the likelihood of recidivism." *Id.*.[13]   Courts have also granted downward departures "based upon the likelihood of successful treatment." *U.S. v. Davis,* 763 F.Supp. 645, 652 (D.D.C. 1991); *see also U.S. v. Maier,* 975 F.2d 944, 945 (2nd Cir. 1992); *U.S. v. Maddalena,* 893 F2d 815, 817-818 (6th Cir. 1989); *U.S. v. Sklar,* 920 F.2d 107, 116-117 (1st Cir. 1990); *U.S. v. Williams,* 948 F.2d 706, 710-711 (11th Cir. 1991). Such departures have been made even if the treatment was initiated after the defendant's arrest. *Wilkes,* 130 F.Supp.2d at 241; *Maier,* 975 F.2d at 945.

Mr. Cash is not attempting to downplay the significance of his alcohol related convictions, *see, e.g., U.S. v. Angel-Guzman,* 506 F.3d 1007 (10th Cir. 2007); indeed,

---

[13] *See also U.S. v. Mishoe,* 241 F.3d 214, 219 (2nd Cir. 2001); *U.S. v. Spencer,* 25 F.3d 1105, 1113 (D.C.Cir. 1994); *Fletcher,* 15 F.3d at 557; *U.S. v. Brown,* 985 F.2d 478, 482 (9th Cir. 1993); *U.S. v. Summers,* 893 F.2d 63, 67-68 (4th Cir.1990); *U.S. v. Wilkerson,* 183 F.Supp.2d 373, 381 (D.Mass. 2002); *U.S. v. Wilkes,* 130 F.Supp.2d 222, 239-40 (D.Mass.2001); *U.S. v. Leviner,* 31 F.Supp.2d 23, 32-34 (D.Mass. 1998); *U.S. v. Miranda,* 979 F.Supp. 1040, 1043-44 (D.N.J.1997), *appeal dismissed,* 159 F.3d 1354 (3rd Cir.1998); *U.S. v. Anderson,* 955 F.Supp. 935, 937 (N.D.Ill.1997).

treatment for his alcoholism has only served to reemphasize the dangers of such conduct. Mr. Cash acknowledges alcohol played a role in his poor decision-making during the period when the instant offense was committed. However, because he has received intensive treatment at Talbot and continues to participate in Alcoholics Anonymous meetings (averaging one meeting *every* day), his likelihood of future alcohol-related offenses is greatly lessened. *See* Exhibit 10, *Casper Letter*. ***By the time of his sentencing, Mr. Cash will have been sober for two solid years.*** Moreover, his prior alcohol-related offenses are of a wholly different nature than the instant offense. In other words, if the Court sentences Mr. Cash under the higher Criminal History Category based on his prior offenses, the Court will essentially be sentencing him to additional time for his problems with alcohol. The prior offenses bear no similarity to the instant offense and have no predictive value on Mr. Cash's potential for recidivism.

### D.    Multiple Factors Collectively Considered.

Under appropriate circumstances, "[t]he court may depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure…" USSG § 5K2.0(c); *see also U.S. v. Jones,* 158 F.3d 492, 499-500 (10th Cir. 1998) ("A factor may be considered in the aggregate if it is "atypical," even though it may not be sufficient, in and of itself, to support a departure."). Thus, additional factors must make the case an "exceptional" one, must be "present to a substantial degree," and be "identified in the guidelines as a permissible grounds for departure." 5K2.0(c).

In addition to his extraordinary efforts to pay restitution and escape the grasp of his alcoholism (which in turn is clearly the sole basis for his prior criminal history), Mr. Cash's offender characteristics discussed in the Motion for Variance make this case an exceptional one and provide grounds for departing from the guideline range.  Thus, even if the Court did not find that Mr. Cash's unique efforts to pay restitution, his relationship with his ex-wife and his efforts to recover from alcoholism were sufficient to merit a departure, the Court should grant the departure based on those extraordinary efforts as well as the reasons set forth in Mr. Cash's Motion for Variance.

## <u>CONCLUSION</u>

For the reasons set forth above and those contained in Mr. Cash's Motion for Variance, Mr. Cash requests the Court grant this Motion for Downward Departure and depart to a guideline level in Zone A, allowing the court to consider a sentence of probation under the guidelines.

Respectfully submitted,


s/*Daniel G. Webber, Jr.*
PATRICK M. RYAN, OBA#7864
DANIEL G. WEBBER, JR., OBA#16332
MATTHEW C. KANE, OBA#19502

For the Firm:

RYAN WHALEY COLDIRON SHANDY PLLC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, OK  73102
dwebber@ryanwhaley.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2010, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jeb Boatman
Sanford C. Coats
United States District Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK  73102

s/*Daniel G. Webber, Jr.*
DANIEL G. WEBBER, JR.